IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| KARMEL DAVIS AND ASSOCIATES, ATTORNEYS-AT-LAW, LLC, individually and on behalf of all others similarly situated,<br><br>　　Plaintiff,<br><br>　　　　　v.<br><br>THE HARTFORD FINANCIAL SERVICES GROUP, INC. and HARTFORD CASUALTY INSURANCE COMPANY,<br><br>　　Defendants. | Case No. 1:20-cv-02181-WMR |

## ORDER

This matter is before the Court on the Motion to Dismiss Plaintiff's First Amended Complaint [Doc. 53] and the Motion to Dismiss the Amended Nationwide Class Action Claims [Doc. 54] filed by Defendant Hartford Casualty Insurance Company ("HCIC"). Having considered the contents of the First Amended Complaint, HCIC's opening and reply brief in support of the Motions, Plaintiff's opposition to the Motions, and the arguments of counsel at the November 30 hearing, the Court hereby **GRANTS** HCIC's Motions [Doc. 53, 54]. Accordingly, Plaintiff's First Amended Complaint is dismissed with prejudice, and the Class Action Claims are dismissed without prejudice.

1

I.     BACKGROUND

   A. The Parties and the Insurance Policy

Plaintiff Karmel Davis and Associates, Attorneys-At-Law, LLC ("Plaintiff" or "Karmel"), is a Georgia-based law firm that focuses primarily on bankruptcy litigation. [Doc. 50, ¶¶ 1-2]. Defendant HCIC is an Indiana insurance company with its principal place of business in Hartford, Connecticut. [Doc. 50, ¶ 9]. This action involves an insurance policy (the "Policy") that Plaintiff has maintained with HCIC since 2010. [Doc. 50, ¶ 14].

The Policy is a Spectrum Business Owner's Policy, a kind of "all-risk" policy that contains a Special Property Coverage Form. [Doc. 50, ¶¶ 14-16]. The Covered Property is 3379 Hwy 5, STE A-AA, Douglasville, GA 30135, the location of the Karmel firm. [Doc. 50, ¶ 14]. In the Special Coverage Property Form, Defendant agreed to pay "for direct physical loss of or physical damage to Covered Property…caused by or resulting from a Covered Cause of Loss." [Doc. 1-1 (Exhibit A- Special Property Coverage Form) at 26]. Specifically, a "Covered Cause of Loss" is defined as any "RISKS OF DIRECT PHYSICAL LOSS," unless already listed as one of the exclusions. [Doc. 1-1 at 27].

There are several relevant coverage provisions in the Policy at issue in this case: coverage for Business Income, Extended Business Income, Extra Expense,

Business Income from Dependent Properties, and Civil Authority. [Doc. 50, ¶¶ 20-27].

1. According to the **Business Income** coverage provision, HCIC agrees to "pay for the actual loss of Business Income" if business operations are necessarily suspended because of "direct physical loss of or physical damage to the property." [Doc. 1-1 at 35].

2. The **Extended Business Income** coverage provision provides that HCIC will pay for certain additional amounts of lost business income "caused by direct physical loss or physical damage" at Plaintiff's office, the covered property. [Doc. 1-1 at 36].

3. The **Extra Expense** coverage provision provides that HCIC will pay for "reasonable and necessary Extra Expense" incurred by Plaintiff during the "period of restoration" of Plaintiff's law office in the event of "direct physical loss or physical damage to" the law office. [Doc. 1-1 at 35].

4. The **Business Income from Dependent Properties** coverage provision provides that HCIC will pay for "the actual loss of Business Income [that Plaintiff] sustain[s] due to direct physical loss or physical damage at the premises of a dependent property." [Doc. 1-1 at 36]. The Policy defines a "Dependent Property" as a property owned, leased, or operated by others that Plaintiff depends on to (a) deliver materials to it or others for its

      account, (b) accept its products or services, (c) manufacture its products, or (d) attract customers to its business premises. [Doc. 1-1 at 37].

5. The **Civil Authority** coverage provision provides that HCIC will pay for "the actual loss of Business Income" sustained by Plaintiff when access to Plaintiff's law office "is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate area of" the office. [Doc. 1-1 at 36].

### B. COVID-19 and the Shelter Order

On January 30, 2020, the World Health Organization ("WHO") declared the COVID-19 outbreak a "Public Health Emergency of International Concern." [Doc. 50, ¶ 29]. The WHO later declared it a global health pandemic. [*Id.*]. On March 13, 2020, President Trump declared a state of national emergency, and several state governors followed, including Governor Brian Kemp. [Doc. 50, ¶¶ 29, 35]. His Executive Order was issued on March 14, 2020, declaring a public Health State of Emergency in Georgia. [Doc. 50, ¶ 35]. Then, on April 2, 2020, he issued a statewide Shelter in Place Executive Order. [Doc. 39-2 (the "Shelter Order")].

The Shelter Order was issued to help limit the spread of the virus throughout communities, "requiring the implementation of certain restrictions" to do so. [Doc. 39-2 at 2]. One of those measures required residents to shelter in place within their homes or places of residence. [Doc. 39-2 at 3]. There were, however, four exceptions

to the requirement: for conducting essential services, performing necessary travel, engaging in minimum basic operations for a business, or for being actively engaged in work for critical infrastructure. [Doc. 39-2 at 3-4]. Per the Shelter Order, the term "critical infrastructure" includes "entities that provide legal services." [Doc. 39-2 at 6]. All businesses engaged in critical infrastructure were permitted to continue in-person operations, but were required to "implement measures which mitigate the exposure and spread of COVID-19 among its workforce." [Doc. 39-2 at 5].

Because of COVID-19 and the Shelter Order, Plaintiff claims it was no longer able to meet with clients in person, thwarting its business and ultimate business purpose. [Doc. 50, ¶ 41]. For example, Plaintiff was still required to obtain original signatures for certain bankruptcy documents, but due to the threat of contracting the virus, Plaintiff did not bring clients into the office and instead paid postage to mail bankruptcy documents to and from its clients. [Doc. 50, ¶ 44]. And, because the threat of COVID-19 is ongoing and has not yet abated, Plaintiff alleges that its business continues to suffer. [Doc. 50, ¶ 45].

### C. The Lawsuit

Because of the losses allegedly suffered, Plaintiff submitted a claim to Defendant HCIC for coverage under the Policy. Yet, the claim was denied, primarily because HCIC found that there was no "physical loss or damage caused by or resulting from a Covered Cause of Loss." [Doc. 50, ¶ 52]. In other words, "since the

coronavirus did not cause property damage at [Plaintiff's] place of business or in the immediate area, this loss [was] not covered." [*Id.*]. Moreover, Defendant stated that there was no Civil Authority coverage because no civil authority issued an order prohibiting Plaintiff's business from operating or that contributed to a direct physical loss. [*Id.*].

Plaintiff subsequently filed its Complaint on May 21, 2020. [Doc. 1]. The Complaint was amended and refiled on September 18, 2020 (the "First Amended Complaint"). [Doc. 50]. Plaintiff seeks relief for six claims and brings the action individually and on behalf of five putative nationwide classes. [Doc. 50, ¶ 61].

In that Complaint, Plaintiff claims that "[t]he presence of COVID-19 and the Shelter Order constitute a Covered Cause of Loss," as they are "RISKS OF DIRECT PHYSICAL LOSS." [Doc. 50, ¶ 46]. Specifically, Plaintiff alleges that COVID-19, the Shelter Order, "and the actual damage in the form of the likely physical presence of COVID-19 on or within the property" are direct physical losses that caused the suspension of Plaintiff's legal business. [Doc. 50, ¶ 47]. This physical loss, Plaintiff argues, caused an actual loss of Business Income. [Doc. 50, ¶ 49]. It is also argued in the First Amended Complaint that the Shelter Order implicates the Civil Authority coverage provision because access to the Plaintiff's premises was prohibited by the Shelter Order. [Doc. 50, ¶ 48].

Defendant HCIC filed a Motion to Dismiss Plaintiff's First Amended Complaint and a Motion to Dismiss the Claims on behalf of the Nationwide Class Members. [Docs. 53, 54]. These Motions are presently before the Court.

## II. LEGAL STANDARD

A complaint that "fail[s] to state a claim upon which relief can be granted" is subject to dismissal under Federal Rule of Civil Procedure 12(b)(6). To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The complaint must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Yet, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

For purposes of a motion to dismiss, the Court may consider "documents incorporated into the [C]omplaint by reference" and "matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). In addition, the Court may consider materials that are cited and referred to in the Complaint, provided the materials are central to Plaintiff's claims and the contents of those documents are not in dispute. *See Fin. Sec. Assur., Inc. v. Stephens,*

*Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007). Thus, in deciding HCIC's Motions, the Court will consider the Policy, the Shelter Order, and the Bankruptcy Court orders that were attached to or referenced in the First Amended Complaint.

### III. DISCUSSION

In Georgia, "insurance is a matter of contract, and the parties to an insurance policy are bound by its plain and unambiguous terms." *Hays v. Ga. Farm Bureau Mut. Ins. Co.*, 314 Ga. App. 110, 111 (2012). "Where the contractual language unambiguously governs the factual scenario before the court, the court's job is simply to apply the terms of the contract as written, regardless of whether doing so benefits the carrier or the insured." *Reed v. Auto-Owners Ins. Co.*, 284 Ga. 286, 287 (2008). In this case, the plain and unambiguous terms of the Policy preclude Plaintiff's claims for coverage, and the First Amended Complaint must therefore be dismissed.

#### A. Business Income

In Claims I through III, Plaintiff seeks to recover business income and extra expenses that it incurred under the Business Income, Extra Expense, and Extended Business Income coverage provisions of the Policy. [Doc. 50, ¶¶ 76-110]. Similarly, in part of Claim VI, Plaintiff seeks a declaration that its business-income losses and extra expense due to COVID-19 and the Shelter Order are covered losses under these provisions of the Policy. [Doc. 50, ¶¶ 132–142]. To recover, Plaintiff must show that

the losses were due to a suspension of operations at its law office caused by direct physical loss or physical damage to that space. [Doc. 50, ¶¶ 20–22].

Plaintiff argues that the Shelter Order and the "likely presence of COVID-19 on or within the property" were the direct physical losses that caused it to suspend its business operations. [Doc. 50, ¶ 47]. Yet the Policy is clear that a direct physical loss must cause the suspension of operations, and according to Georgia law, these are not direct physical losses. A "direct physical loss or damage" to property occurs only when there is "an actual change in insured property then in a satisfactory state, occasioned by accident or other fortuitous event directly upon the property causing it to become unsatisfactory for future use or requiring that repairs be made to make it so." *AFLAC, Inc. v. Chubb & Sons, Inc.*, 260 Ga. App. 306, 308 (2003). In other words, the change to property must be a "physical change." *Henry's La. Grill, Inc. v. Allied Ins. Co. of Am.*, 1:20-CV-2939-TWT, 2020 WL 5938755, at *4 (N.D. Ga. Oct. 6, 2020).

Here, the "likely" presence of COVID-19 cannot be regarded as a physical change, as it does not and has not physically altered the insured property. Although the virus is transmitted through the air and may adhere to surfaces briefly, there is no indication that it causes any sort of physical change to the property it touches. *See, e.g., Sandy Point Dental, PC v. Cincinnati Ins. Co.*, No. 20 CV 2160, 2020 WL 5630465, at *3 (N.D. Ill. Sept. 21, 2020) ("The coronavirus does not physically alter

9

the appearance, shape, color, structure, or other material dimension of the property"). The mere fact that it may rest unseen on surfaces before it can be cleaned up with a disinfectant is not the kind of direct physical change contemplated by Georgia law. *See Mama Jo's Inc. v. Sparta Ins. Co.*, 823 F. App'x 868, 879 (11th Cir. 2020) (noting that "an item or structure that merely needs to be cleaned has not suffered a 'loss' which is both 'direct' and 'physical.'").

Yet, even if it did, Plaintiff has not indicated that COVID-19 was ever found on the premises. Instead, Plaintiff assumes that the virus was "likely" physically present, without providing any proof that employees or other people on the property were infected at the time. [Doc. 50, ¶ 47]. Thus, without more, these are mere blanket allegations and are too generalized to support the conclusion that COVID-19 caused physical damage to Plaintiff's property. *See, e.g., Water Sports Kauai, Inc. v. Fireman's Fund Ins. Co.*, No: 20-cv-03750-WHO, 2020 WL 6562332, at *4 (N.D. Cal. Nov. 9, 2020) ("There are no facts plausibly alleging an actual [COVID-19] exposure at one or more Sand People stores, much less that an actual physical exposure caused them to close a particular store or set of stores.").

Plaintiff also attempts to argue that not being able to access its law office because of COVID-19 is a direct physical loss of or physical damage to property; however, this argument is also unsuccessful. [Doc. 50, ¶ 47]. "Under Georgia law, losses from inability to use property do not amount to 'direct physical loss of or

10

damage to' the property within the ordinary and popular meaning of the phrase." *K D UNLIMITED INC. v. OWNERS INSURANCE COMPANY*, No. 1:20-CV-2163-TWT, 2021 WL 81660, at *4 (N.D. Ga. Jan. 5, 2021). "[T]he words 'loss of'… and the words 'damage to' make it clear that coverage is predicated upon a change in the insured property resulting from an external event rendering the insured property, initially in a satisfactory condition, unsatisfactory." *AFLAC, Inc.*, 260 Ga. App. at 308; *see also Ne. Ga. Heart Ctr., P.C. v. Phoenix Ins. Co.*, No. 2:12-cv-00245-WCO, 2014 WL 12480022, at *6 (N.D. Ga. May 23, 2014). And, "[a]lthough the Court construes insurance contracts in favor of the insured, the Court cannot rewrite the contract" to provide coverage for loss of use when there has been no physical change to the property. *K D UNLIMITED INC.*, at *4. Thus, since no physical change to Plaintiff's law firm occurred here, Plaintiff's mere loss of use theory cannot be maintained.[1]

---

[1] Several other courts have also considered and rejected Plaintiff's position, particularly in the COVID-19 context. *See, e.g.*, *Uncork and Create LLC v. Cincinnati Insurance Co.*, No. 2:20-cv-0041, 2020 WL 6436948 (S.D. W. Va. Nov. 2, 2020); *Raymond H Nahmad DDS PA v. Hartford Casualty Insurance Co.*, No. 1:20-cv-22833, 2020 WL 6392841, (S.D. Fla. Nov. 1, 2020); *Seifert v. IMT Insurance Co.*, No. 20-1102, 2020 WL 6120002, (D. Minn. Oct. 16, 2020); *Infinity Exhibits, Inc. v. Certain Underwriters at Lloyd's...*, No. 8:20-cv-1605, 2020 WL 5791583 (M.D. Fla. Sept. 28, 2020); *Sandy Point Dental, PC v. Cincinnati Insurance Co.*, No. 20-CV-2160, 2020 WL 5630465 (N.D. Ill. Sept. 21, 2020); *Pappy's Barber Shops, Inc. v Farmers Group, Inc.*, No. 20-cv-907, 2020 WL 5500221 (S.D. Cal. Sept. 11, 2020); *10E, LLC v. Travelers Indemnity Co.*, No. 2:20-cv-04418, 2020 WL 5359653 (C.D. Cal. Sept. 2, 2020*); Malaube, LLC v. Greenwich Insurance Co.*, No.

Further, the Shelter Order itself did not cause an actual, physical change to Plaintiff's law office. In *Henry's Louisiana Grill*, Chief Judge Thrash assessed whether a COVID-19 Order issued by Governor Kemp caused an actual, physical change to a restaurant and concluded that it did not, particularly because "[e]very physical element of the [restaurant]…underwent no physical change as a result of the Order." 2020 WL 5938755, at *4-5. Similarly, Plaintiff's law office here was not physically altered because of the Shelter Order. Rather, the Order only limited Plaintiff in how it could use its law office for the duration of the Order. [Doc. 39-2 at 4–5]. These claims for coverage must therefore be dismissed.

### B. Business Income from Dependent Properties

Similarly, in Claim IV and part of Claim VI, Plaintiff seeks coverage under the Business Income from Dependent Properties coverage provision of the Policy for business income losses that it alleges it incurred due to changes in operations of the Bankruptcy Court. [Doc. 50, ¶¶ 111-21, 132-37, 141]. Recovery under these provisions also requires that the business income loss be "due to direct physical loss or physical damage" at a "Dependent Property." [Doc. 1-1 at 36]. But, because Plaintiff cannot establish these requirements according to the plain language of the Policy, Plaintiff cannot succeed on its claims.

---

20-22615, 2020 WL 5051581 (S.D. Fla. Aug. 26, 2020); *Diesel Barbershop, LLC v. State Farm Lloyds*, No. 5:20-cv-461, 2020 WL 4724305 (W.D. Tex. Aug. 13, 2020).

First, although Plaintiff states that the Bankruptcy Court is a Dependent Property [Doc. 50, ¶ 49], it does not allege the specific facts establishing the Bankruptcy Court as a Dependent Property under the Policy. The Policy defines a Dependent Property as property owned, leased, or operated by others that Plaintiff depends on to (a) deliver materials to it or others for its account, (b) accept its products or services, (c) manufacture its products, or (d) attract customers to its business premises. [Doc. 1-1 at 37]. But, nowhere in the First Amended Complaint does Plaintiff address or demonstrate why the Bankruptcy Court qualifies as a Dependent Property.

Even if it did, Plaintiff has not alleged that it lost business income due to "direct physical loss or physical damage" at the Bankruptcy Court. Instead, the First Amended Complaint alleges that Plaintiff lost business income because the Bankruptcy Court "has issued numerous orders altering its court operations because of the state of emergency surrounding COVID-19 and the Shelter Order." [Doc. 50, ¶ 38]. Put differently, Plaintiff alleges that it lost business income because the Bankruptcy Court altered its court operations to limit face-to-face interactions to minimize the spread of COVID-19, not because the Bankruptcy Court experienced an actual, physical change. These allegations are thus insufficient to support a claim for coverage under this provision of the Policy.

**C. Civil Authority**

Moreover, in Claim V and the rest of Claim VI, Plaintiff seeks coverage under the Civil Authority provision in the Policy. [Doc. 50, ¶¶ 27, 122-131, 142]. The claimed coverage is for an "actual loss of Business Income" sustained by Plaintiff during a 30-day period "when access to [its law office] is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate area of [its law office]." [Doc. 1-1 at 36]. Yet, by the Policy's and the Shelter Orders' own terms, the civil authority coverage does not apply.

First, the Shelter Order that Plaintiff says triggers coverage under the Civil Authority provision did not specifically "prohibit" Plaintiff from continuing in-person operations at its law office. Rather, the Order provided that businesses engaged in "critical infrastructure," including "entities that provide legal services," were exempt from the Order's prohibition. [Doc. 39-2 at 3-4, 6]. Thus, Plaintiff—a law firm providing legal services—was permitted to continue in-person operations, the only requirement being that Plaintiff had to "implement measures which mitigate the exposure and spread of COVID-19 among its workforce." [Doc. 39-2 at 5]. The Order therefore did not prohibit access to Plaintiff's law office, thereby precluding Plaintiff from recovering under this Policy provision.

Further, even if the Order had prohibited Plaintiff from accessing its office, the Order was not issued as a "direct result" of physical loss. Courts routinely reject these claims where, as here, orders of civil authority are aimed at fear of future harm, not existing property loss or damage. This Court concluded in *Paradies Shops, Inc. v. Hartford Fire Ins. Co.*, "that an order . . . that is designed to prevent, protect against, or avoid future damage is not a 'direct result' of already existing property loss or damage." No. 1:03-CV-3154-JEC, 2004 WL 5704715, at *7. And, in *United Air Lines v. Ins. Co. of the State of Pa.*, the court likewise held that any prohibition of access to premises at Ronald Reagan National Airport after the September 11 attacks was not covered by civil-authority insurance because the government's "decision to halt operations at the Airport indefinitely was based on fears of future attacks," not because of property damage at the nearby Pentagon. 439 F.3d 128, 134 (2nd Cir. 2006). Thus, since no direct property loss or damage prompted the issuance of the Shelter Order in this case, these claims must also be dismissed.

### D. Class Claims

Because the claims of the named Plaintiff fail, the putative class claims must also fail, and the First Amended Complaint is therefore dismissed in its entirety.

## IV. CONCLUSION

For the reasons above, the Motions to Dismiss are hereby **GRANTED**. [Docs. 53, 54]. Accordingly, Plaintiff's First Amended Complaint is dismissed with prejudice [Doc. 50], and the Class Claims are dismissed without prejudice.

**IT IS SO ORDERED** this 26th day of January, 2021.

_____
WILLIAM M. RAY, II
UNITED STATES DISTRICT JUDGE